The Honorable, the Judges of the United States Court of Appeals for the 8th Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 8th Circuit is now in session. All persons having business before this Honorable Court may now draw near and they will be heard. God save the United States and this Honorable Court. Thank you. If you would, please call our first case for argument this morning. Case number 19-3044. Case number 20-1378. Central Valley AG Cooperative v. Daniel Leonard et al. Okay, Ms. Thorne. Good morning. My name is Amy Thorne and I represent the appellant, Central Valley Ag Cooperative, in its capacity as the fiduciary of its ERISA health plan. Your Honors, as defendant of the benefit group, which I'll refer to as TBG, conceded in its briefs, this case presents novel and difficult issues. We covered all of those issues in our briefs, all of which we submit merit your attention. But the utterly decisive point is the district court's error in finding that TBG and defendant Amps were not fiduciaries. This incorrect finding on fiduciary status set the district court down the wrong path for everything that followed. Not only is the decision not in line with ERISA's fiduciary definitions and the interpreting case law, but it can't be squared with this court's recent decision in Rosso v. Principal Light, which was decided after the district court's decision and in which the Supreme Court just denied cert. Under Rosso, TBG and Amps became fiduciaries for three reasons. When they manipulated the MBR claims submission criteria and increased their fees. When they took undisclosed... Well, if we're going to use Rosso and McCaffrey and Teets and that line of cases, do prong wine. Did they not merely follow a specific contractual term? They did not, Your Honor. Under the MBR program, TBG and Amps did not merely follow a contractual term. Instead, they took unilateral action per the Rosso test relating to plan management and plan assets by changing the MBR contractual terms regarding which claims would be submitted for their review. That unilateral action meets the first part of the test, Your Honor. Well, Counsel, now that's in the second prong. I don't mean to be technical here, but if you look at Rosso, Teets, McCaffrey, that's in the second prong, unilateral action. The first is, did not merely follow a contractual term. I apologize, Your Honor. So, I was launching into the second part of the test, but to be clear, the specific contract term here was not followed because the contract, the MBR contract, set forth 10 criteria which would be used to submit claims for review. TBG and Amps changed that criteria to increase the number of claims they reviewed and the fees they therefore received because the more claims they reviewed, the more fees they got. That's not following the contract terms. The action was unilateral and also meets the second part of the test because TBG and Amps did not obtain the contractually required consent of CVA when they made these changes. The contract said to make changes to the claim submission criteria, you must obtain written consent from CVA, and in fact, TBG and Amps' expert agreed that written consent to change those contractual terms was required. So, the second part of the Rosso test is met as well. Well, now wait. It says unilateral action. Unilateral means one side. I thought every single claim here, as you know it's the theme of the other side, every single claim here was sent to you some way and somehow you approved every dad-burn one of them. What's the answer? That is the defendant's argument, Your Honor. It was hotly contested whether the weekly funding request, which is the document that the defendants say, quote, identified all the fees to be paid Amps. They say it's the weekly funding request that we approved and that means we knew about what was happening. First of all, only Amps is listed on those requests, not TBG. If you put eyes on the actual weekly funding requests, which is TBG's addendum page 12, you will see that it's a spreadsheet-like document that contains only dates of service, a claim number, the name of the provider, the name of the participant and a dollar figure. It does not contain any information about under which criteria the claim was adjudicated and so CBA had no way of knowing whether those claims fit under the criteria or not. They had no reason to believe that TBG and Amps were not following the criteria. We learned this during the course of the case. Second, the opacity of those weekly funding requests was laid bare in the deposition of TBG's in-house counsel. When confronted with a weekly funding request, TBG's in-house counsel was unable to determine what CBA was being billed in fees and conceded that CBA was not able to understand what fees it was being charged in those weekly funding requests. Significantly, CBA raised this claims manipulation criteria issue in detail and how this conduct made Amps and TBG fiduciaries before the district court. None of this is even mentioned in the district court's decision when it ruled that TBG and Amps were not fiduciaries. If there was any doubt before, we now know that Rosso's fiduciary test governs the MBR claims submission criteria issue and that under that test, TBG and Amps were fiduciaries. As a result, summary judgment should not have been granted in favor of the defendants, should have been granted in favor of CBA. But at a minimum, summary judgment should not have been granted in favor of the defendants or in front of TBG and Amps on this issue because there was a disputed issue of fact about who made the decision, whether it was TBG, whether it was Amps, or whether it was the both of them who made the decision to change the claims submission criteria. I started to say, Your Honor, that TBG and Amps were fiduciaries for a number of reasons under the Rosso test. The second reason they became fiduciaries was because they exercised unilateral authority over plan assets when with Amps' help, TBG took an undisclosed, unauthorized 7.5% of fees under MBR. Again, CBA had no opportunity to reject that setup because they kept it hidden. So the Rosso test is met for this conduct as well. But even without regard to Rosso, the district court committed reversible error. This court held over a decade ago in Brayden v. Walmart that information regarding service provider fees is material when nondisclosure would mislead and impede the ability to make an informed decision. Just like the district court in Brayden, the district court here didn't apply the materiality test to the failure to disclose the fees and instead just concluded that there was no duty to disclose the fees. As it did in Brayden, that failure constitutes reversible error. Now, defendants argue that the ERISA disclosure statement put CBA on alert that they were going to get these fees. Counsel, I'm a sentence or two behind you. In Brayden, it was acknowledged they were fiduciaries, right? Period, period, period? In Brayden, the defendant was this planned sponsor and yes, it was acknowledged to be a fiduciary. But what was at issue were the underlying revenue sharing fees of the other service providers. And so when the court talked about whether those fees needed to be disclosed and as a result of them not being disclosed, there had been a breach, it said they were material. That whether they were to be disclosed was material and that the materiality test needed to be applied. I thought in that case the people who did not disclose were fiduciaries. Is that right or wrong? I believe that's incorrect, Your Honor. I think it's wrong. Okay, go ahead. Yes. So, I'm talking about the ERISA disclosure statement because the defendants make a big deal about this statement. It's a one-page document that TBG prepared. It's important to look at what it was all about. To be clear, the disclosure statement states that it was being provided to CBA to evaluate the reasonableness of TBG's, quote, total compensation, close quote, based on fees from other vendors. It then goes on to say that TBG, again, quote, may receive, close quote, other certain fees. But again, underbrain, saying you may receive versus or instead of you already know you are going to receive is material and it's particularly material under these circumstances because TBG knew it had a side contract with AMPS to get a kickback of 7.5% and that agreement was never disclosed to CBA. It was only discovered during discovery. It's material here because TBG's undisclosed fees exceeded its disclosed fees. What this meant was it made it impossible for the ERISA disclosure statement to do what it was supposed to do, which was to reveal to CBA TBG's total compensation. I thought you said the magic word total. I thought that the 30% was a total that CBA knew about. And this is just a split up of that 30% and so to you it doesn't make any difference because it's a total. It makes a difference for this reason, Your Honor. First of all, if CBA had known that AMPS was willing to do the work for 22.5% instead of 30% because for all it knew it was only paying AMPS 30%. But AMPS ultimately took only 22% of that and kicked back 7.5% to TBG. So if it had known that AMPS was willing to do the work for 22.5% then it wouldn't have negotiated that rate. Also, importantly, the extra 7.5% that went to TBG was on top of the contractual fee that TBG did disclose to CBA for $18.15 per employee per month. That is in a separate agreement, the Administrative Services Agreement, that TBG entered into with CBA. So that is what CBA thought TBG was getting. So it's material in that way, Your Honor, too. It's not just about the fact that we agreed to 30%. We agreed to 30% to AMPS. And hiding fees meant we could not fulfill our fiduciary duty to determine whether TBG's fees under these circumstances were reasonable or excessive. But that's what the ERISA disclosure statement says it intended to do. Counsel, is that then your alleged loss to the plan? I'm sorry, Your Honor, you cut out. I was asking if that was the alleged loss to the plan, what you just explained. So, Your Honor, this is an argument that the defendants have made that because it was a savings to the plan then there's no loss to the plan. But ultimately what happened was that these MBR services created chaos with the providers which resulted in the providers filing a lawsuit against CBA based on the adjudications by TBG and AMPS under MBR. CBA ended up having to spend hundreds of thousands of additional dollars to resolve those claims. So any purported savings under RBR was illusory at best. So going back to MBR and then I'm going to go on to RBR. Judge Gross asked it kind of fancy, I'll ask it kind of plain. In my last court we'd say, you don't have any damages. Your Honor, we have damages here for the excessive fees. And we are entitled under the prohibited transaction rules to seek disgorgement of any excessive fees. The undisclosed fees were excessive. In addition, Your Honor... Judge Erickson has a question. Turn your mind, Judge Erickson, I think, if I read your mind. I'm sorry, how can they be excessive when they're consistent with the contractual terms? They're only consistent with the contractual terms with respect to AMPS, Your Honor. I just want to make clear, the MBR contract provided for a fee only to AMPS, not to TBG. TBG and AMPS cannot wash payments through each other as a way to avoid liability for undisclosed and potentially excessive fees. In fact, Your Honor, if the district court's decision is left to stand, it means that service providers have carte blanche to make opaque and misleading statements about their fees. And under that rule, a fiduciary could never fulfill its fiduciary responsibility to ensure that the plan is only paying reasonable fees. Now, we also had hidden fees under RBR. RBR was the second year of the relationship. And in that case, the defendants also fall under the Rozo test, if you will, because they exercised, again, unilateral authority over plan assets by taking an additional undisclosed, unauthorized 2.5% in fees. So the parties all executed an RBR agreement. The parties to that agreement, to be clear, are CBA, TBG, AMPS, and AMPS' subsidiary, CDS. And it's also undisputed that AMPS' subsidiary, CDS, was a named fiduciary under that contract. A quote-limited fiduciary, right, Counsel? Correct, but a fiduciary nonetheless, Your Honor. Proceed. And so I'm going to use AMPS and CDS interchangeably. I will refer to them as AMPS, as the district court did, and they were treated interchangeably throughout the case. So the RBR agreement provided for a fee of 10% of gross billed charges, and that fee of 10% was to AMPS only. Notwithstanding, when TBG prepared and submitted the weekly funding requests and sent it to CBA, it included an extra 2.5% in fees in the amounts billed. In other words, it billed 12.5%, not the 10% required by the contract. TBG then collected the 12.5% and sent it to AMPS, the whole 12.5%. AMPS had no contractual authority whatsoever through any agreement to ever receive 12.5%. AMPS then kicked back 2.5% to TBG. TBG has no authority whatsoever in the—thank you, Your Honor. Yeah, I want to make sure you know that. Some can't see the clock. Proceed. You're using your rebuttal. Thank you. So in any event, Your Honor, the contract, the RBR contract, called for a 10% fee, and the defendants, TBG and AMPS, overcollected a 2.5% fee. Recognizing they had no authority to do that, the TBG and AMPS drafted an amendment, but it's undisputed that CBA never received that amendment, never executed that amendment. Despite that, TBG and AMPS continued to collect the 2.5%. The district court committed clear error when it modified that contract based on a pre-contract email. But the agreement itself has an entire agreement provision that says it can't be modified by any other writing. It, of course, wrote contract law that parole evidence cannot be used to change an executed agreement. The email the district court relied upon to modify the agreement doesn't even discuss a fee to TBG. Most importantly, no service provider can belatedly use a Scrivner's error to unilaterally raise their fees with an ERISA plan. But the prohibited transaction rules do prohibit that conduct. So, if left intact, the district court's ruling would stand for the proposition with respect to the RBR issue that we apply a lower standard of construction regarding ERISA plan documents than we do to commercial agreements. And that rule would turn ERISA on its head. So, summary judgment should be rendered in favor of CBA on that point. Your Honor, I'll reserve the remaining of my rebuttal. Thank you. Okay. Mr. Talkin, I understand you're going first. I am, Your Honor. Good morning, Your Honors. My name is Tim Talkin. I am the attorney for the benefit group who is the third-party administrator of a health care plan sponsored by CBA for which CBA was the named fiduciary. Judge Smithkamp's decision in this case should be affirmed in its entirety because TBG was not a fiduciary. It breached no fiduciary duties, and it engaged in no prohibited transactions. The undisputed evidence in this case established that CBA, as the fiduciary of the plan, chose the plan design. It chose the NBR program. CBA chose the RBR program. CBA approved every transaction at issue in this case. And not a penny of plan funds were spent without CBA's express approval. Well, what they're trying to say is what you gave them to approve. Now, they're claiming they were really not too bright. But still, what you gave them to approve was just some kind of sheet with numbers on it, and they just approved it. What do you say to that? Well, that's wrong, first of all. If you look at our addendum, it gives you an example. So there's really two issues here. There's NBR. If you look at TBG's addendum at 10, under the NBR program, we would send an email which would identify the name of the patient, the date of service, the bill charge, the PPO allowable rate, and the AMPS recommended rate. We would then follow that up with a weekly funding request, which was more limited. It didn't have the bill charges. But you could certainly look at, for example, TBG addendum 10, that exemplar, and say, okay, well, we're getting this amount of savings. These are the charges. And if you want more information as the fiduciary, it's your job, CBA, to ask for that information. They never did. They simply approved these, and they approved every one of them. And now they're claiming, oh, well, TBG should be held liable because we approved these claims. The point, Your Honor, under NBR is that CBA had final authority over every claim. And TBG and AMPS couldn't control their fees, as Ms. Thorne suggested. Here's how NBR worked. TBG would receive a claim. It would screen that claim pursuant to 11 criteria set forth in a contract adopted by CBA. If it met the criteria, the claims were sent to AMPS for review. AMPS would review it, make a recommendation. TBG would pass along that recommendation in, as I said, an email and later in weekly funding requests. CBA would review it and approve it. And they approved all of these, except for a few where they decided to pay the PPO rate. And that's really important. Because if CBA did not approve the AMPS recommendation, no fee was paid. Remember, TBG's... Did they ever disapprove one? Did we? No, did CBA ever disapprove what you sent them? Yes, there were situations in which CBA elected to take the PPO rate and not go with the AMPS recommendation. And in those situations, there was no fee. TBG's fee as a service provider was based on a percentage of savings. If they chose the PPO rate, then there's no fee. With respect to TBG's agreement with AMPS, again, it was a subcontract. We were doing the screening pursuant to a separate contract in which we would receive 7.5% of the savings. That is expressly authorized by CBA in the Administrative Services Agreement. And that's at our addendum at page 5, which says that the TPA may receive administration commissions, fees, and or rebates from contracted vendors. It's also in the ERISA disclosure statement where it says that if the employer has chosen to participate in certain programs offered through third-party vendors, including but not limited to cost containment, which MBR was, then we can receive a percentage of the savings. So this was all disclosed and was all approved by CBA ahead of time. And again, what we're talking about here are savings. If there was no MBR program, then CBA would have had to pay the PPO rate, which is clearly higher than the amount that they actually paid. And the savings were split 70% to CBA, 30% to AMPS. And then pursuant to a separate subcontract, we received 7.5%. It was fully disclosed and fully agreed to. With respect to RBR, that was a flat fee. It was 12.5%. And it was agreed to ahead of time. This notion that this was somehow an undisclosed fee is belied by every filing that the plaintiffs made in this case. If you look at their complaint, three of the versions of which were certified by their CEO, they agreed that the deal was it was going to be 10% to AMPS and 2.5% to CBA. On the day they filed their lawsuit, they filed a brief for a TRO, and this is our addendum at page 15, that said, CBA in the plan committed to pay AMPS 10% of its gross hospital claims, whether or not allowed, and TBG 2.5% of gross hospital claims, whether or not allowed. And in addition to TBG's third-party administration fees, for the privilege of accessing and implementing AMPS proprietary savings. So this was all disclosed. It was all approved. And the 12.5% couldn't be manipulated by anyone. It's a flat fee. That falls squarely within this court's decision at ROSA. We were following the contract at step one. And in step two, ultimately, it was CBA's decision whether to agree with the AMPS or CDS recommendations. That's ROSA step two. We don't have control over the MBR, for example, when CBA can unilaterally say, no, we're not going to follow that recommendation. So with respect to the legal claims as a breach of fiduciary duty under 29 U.S.C. 1109, it's axiomatic TBG can't breach a fiduciary duty if it's not a fiduciary, whether we're a fiduciary is a question of law. Judge Smithcamp was correct in performing these ministerial acts. Remember, CBA held the money. It's not as though TBG was just writing checks on CBA's account. We submitted weekly funding requests. If CBA approved the claims, CBA would then transfer the money to TBG. TBG would then issue payments as directed by CBA. That is a classic ministerial act by a service provider. It falls squarely within the regulation that we cited, 29 CFR section 2509. And it's consistent with ERISA law that we don't hold service providers to a higher fiduciary standard when they're performing ministerial acts, which is all CBA was doing. With respect to the prohibited transaction, again, CBA has to prove that we were a fiduciary. The purpose of that rule is to prevent a fiduciary from self-dealing by causing the plan to engage in non-arms-linked business deals. That didn't happen here. Because the party who caused all of this, who made all the decisions, was CBA. CBA was the fiduciary. You used a big word there. You say who did everything. Well, who made the final decision. You said all and everything there, I heard. Who had the final decision is probably more accurate. And that's the key. I thought you wouldn't want to say the all. And that's the key. The issue is who gets to make the final call. We can't control things if CBA can't control us. Your time has expired. And I understand next we have Ms. Mitchell. Good morning. May it please the court, my name is Megan Mitchell, and I represent APALE's Advanced Medical Pricing Solutions, or AMPS, and Claims Delegate Services, CDS. As you've seen from our briefs, AMPS and CDS provided the exact services that CBA contracted for them to provide in return for fees that CBA agreed to pay. But after CBA realized that it did not like the health plan that it adopted, CBA lodged reckless allegations under ERISA and even claimed that the APALE's violated RICO. CBA has never been able to show a single breach of fiduciary duty or any prohibited transaction by AMPS or CDS. Instead, it is asking this court to overturn two well-reasoned judgments from the late Judge Smith-Camp, which correctly entered summary judgment in favor of the APALE's and awarded attorney's fees against CBA. Judge Smith-Camp's opinions were based upon the clear record evidence in this case. Starting with AMPS, the evidence is clear that it was never... Counselor, could I interrupt you because your time is short? Would you start with CDS since they're a limited fiduciary, and does ROSO have any relevance at all to a limited fiduciary? In this case, Your Honor, I don't believe that ROSO has any... It just doesn't play a role because it... No, Counselor, I'm just talking about the one that's a limited fiduciary because, of course, as you know, the key to ROSO is are you or are you not a fiduciary? Correct. And we all agree that CDS is a limited fiduciary. So begin with it and tell us what our guidance is if it's not ROSO. What's our guidance? The guidance for CDS is whether it breached its limited fiduciary duty to the plan. And its limited fiduciary duty to the plan was to administer claims in accordance with the permitted payment levels that CBA set forth in its plan document. CBA's witnesses testified under oath that they were never able to identify any claim that was administered improperly. So CDS performed its limited fiduciary duties under the plan. The only issue here, Your Honor, is with respect to the fees that CBA knew that it would pay for RBR services. I want to just follow up there for a moment. In the record, is there any place at all where there was any allegation that CDS somehow breached its duties related to that post-hospital and facility services provisions for which the limited fiduciary position was established? There were allegations to that effect, Your Honor. They were never borne out by the evidence. So there was never any evidence deduced? No, Your Honor. And that's why CBA's theory in this case changed late in the litigation when they discovered, effectively, they manufactured an argument that the fees were unknown. That really was not an issue until late in discovery when the rest of CBA's claims for breach of fiduciary duty really fell apart when there was no evidence to support them, which also goes to our arguments that the plan has really never shown loss to the plan or damages. For MBR, as you've heard ad nauseum, that program resulted in savings to the plan. During the RBR program, CBA chose to adopt a reference-based reimbursement plan which required health claims to be paid on a Medicare Plus or a Cost Plus basis. CDS's role and AMPS's role in administering that plan was to calculate those claims, determine the amount that would be paid, and then it had additional follow-on limited fiduciary duties with respect to administering those claims. There's no allegations or credible evidence in this case that AMPS or CDS breached those limited fiduciary duties. Counsel, you said a magic word, credible. You didn't really mean that, right? Because we don't judge credibility at this point. No, Your Honor. Judge Smith-Camp correctly found that there were no disputed facts to show that there was any breach of fiduciary duty by AMPS or CDS with respect to its claims administration. Counsel, earlier you mentioned the attorney fee award. I have a question in that regard. Was there ever a determination made in the district court that the RICO claim was frivolous? Your Honor, the RICO claim was dismissed at the motion to dismiss stage. The court expressed extreme disapproval, I would say, of that claim when CVA requested a TRO, but then with subsequent briefing, that claim was dismissed, and so there was not necessarily a finding at that stage that the claim was frivolous. The RICO claim was discussed in Judge Smith-Camp's opinion awarding fees. Counsel, does section 502G1 limit the award of fees to claims under that subchapter? So, you're correct, Your Honor. The ERISA statute does provide for an award of fees to either party under the statute. The district court also has inherent discretion to sanction parties and to award fees. AMPS and CDS also moved for an award of fees under Rule 11. TBG moved for an award of fees under the court's inherent authority as well. And it's important to note that the district court— But let me—they were not awarded under Rule 11, right? They were not awarded under frivolous, right? The district court indicated that those motions were moved. So— They were not awarded under those, right? Go ahead. Yes, Your Honor. Pardon me, Judge Ross, if I interrupted, but I wanted to be sure. Go ahead. Thank you. It's also important to note that Judge Smith-Camp reduced the award of attorneys' fees. So, she went through an analysis and reduced the request from what the parties asked for. In all likelihood, because the RICO claim, to the extent that's your question, whether the fees were awarded under ERISA to cover other claims, the amount of the reduction would have covered any fees that were spent on the RICO claim, which was dismissed early in the litigation. I looked at it too quickly. By about what percent or fraction did she reduce the fees? As to ANTS and CDS, the reduction was, I believe, around 20%. It was a significant reduction. So, there was a reduction to our hourly rates as well as the total amount of hours. Let's see. That's good enough for this purpose. Go ahead. Yes, Your Honor. So, it's important. You've heard TBG's counsel and our briefs point out, over and over, there was never any dispute over what fees CVA agreed to pay for the MBR services and the RBR services that it contracted for. Its own witnesses knew that. Its expert witnesses knew that. This is a legal argument that its attorneys have manufactured. In two complaints under oath, CVA verified what it knew to be true, that the fee to ANTS and CDS was 10% and to TBG that fee was 2%. Because CVA continually asserted claims in this case without basis, ignoring this actual evidence, Judge Smith-Camp properly awarded attorney's fees against it. She aptly found that all of the relevant factors favored an award against CVA and she reasoned that despite its own admissions and affirmations that no fraud had taken place, Central Valley persisted in its claim that defendants conspired to defraud the plan and engaged in prohibited transactions. CVA's claims lacked merit from the beginning of this lawsuit and we respectfully request that her opinion be affirmed. Thank you, Your Honor. Thank you, Ms. Mitchell. Ms. Vogt, over to you. Yes, I represent GMS Benefits, Inc. and Susan and Dan Leonard as individuals. Their role was even more... I will interrupt you just briefly to be sure your camera is on. Are the other judges seeing the advocate? Yes. I am. Oh, so it's a problem with mine. Ms. Vogt, I'm sorry for interrupting you. You'll get a few seconds at the end. You go ahead and proceed. I hear you fine. Okay, thank you. As you may have noticed, nowhere in the opening argument was GMS or the Leonards mentioned or in any way talked about as having any part in the alleged conspiracy, which they have now boiled down to the single allegation that AMPS should not have been paying part of the agreed upon fee to TBG. But GMS was only the broker. At the beginning of 2015 and 2016, as they had done in prior years, GMS Benefits presented options for plans. They included a self-insured option. They included an option that was administered by a third-party administrator other than TBG. And they presented the plans in 2015 with the MBR option and in 2016 with the RBR option. They never acted as anything other than brokers. Their fee of $18 per employee per month was exactly the same no matter what CBA chose. So what CBA chose was they chose the single plan that had the lowest monthly cost. That's what they looked at. They knew there was going to be balanced billing, which they later complained about. They knew exactly what GMS was going to be paid no matter what plan they picked. They have alleged a conspiracy involving GMS, which GMS relationship with CBA did not depend at all on TBG. They regularly presented other options that did not involve TBG. As you may have noticed, GMS was not a member or was not a participant in any of these contracts. GMS had a contract with CBA to act as an insurance broker, and they did that. Now, with regard to Dan and Sue Leonard, in Appellant's entire opening brief, there are two pages that mention GMS. There's not a single mention of the Leonards. In their reply brief, there is only one mention of the Leonards, and that is in one sentence of GMS slash the Leonards. There was absolutely no basis for GMS or the Leonards to be involved in this. There was never any kind of allegation that the Leonards were using GMS improperly that would allow them to pierce the corporate veil. There were no allegations supported by evidence that they did anything other than in their role as employees and officers of GMS. That was their entire involvement. Their one big allegation is that GMS should not have received an additional $1 per employee per month from TBG, but that money was paid out of TBG's assets. To be a prohibited transaction, you have to have plan assets. The money that was paid by TBG to GMS did not come from plan assets. So therefore, the judge was entirely correct in granting summary judgment in favor of GMS and the Leonards, and you should affirm that decision. Thank you. Thank you, Ms. Vogt, and you appeared right after I spoke, and so not to worry. Okay, Ms. Thornton, we're back to you. Yes, Your Honor, I'll pick up with GMS first. The district court cited three Harris Trust cases in its decision finding that GMS was liable and said that ERISA doesn't regulate non-fiduciaries. We know that is not the case based on Harris Trust, and for that reason alone, the district court's decision with respect to GMS must be reversed. With respect to the disclosure statement at RBR, you heard TBG's counsel say that the disclosure statement talks about a percentage of savings. It does. What it doesn't say is anything about gross billed charges, and the RBR services, unlike MBR, were on gross billed charges. So the ERISA disclosure statement similarly does not apply because it doesn't contemplate that setup. You also heard that there were no damages and that all the services were provided just as they should have been pursuant to the contract. These contracts were to reduce plan costs. Plan costs went from $5 million to $10 million under TBG and AMPS. And my time is about out, Your Honor, so thank you very much unless there are any other questions. Okay, seeing no questions for the other two judges, cases number 19.